UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| In re: | ) | Civil Action No. 4:07-mc-181-TLW-TER |
| | ) | |
| Sensormatic Electronics Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | ORDER |
| | ) | |
| The Tag Company US LLC, Phenix Label Company, and Dennis Gadonniex, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | )[1] | |

This action arises out of a patent infringement and misappropriation of trade secrets claim by Sensormatic Electronic Corporation (Sensormatic) against The Tag Company U.S., LLC (Tag), Phenix Label Company (Phenix), and Dennis Gadonniex pending in the United States District Court for the South District of Florida (Case No. 06-81105)(Florida Case). In that case Sensormatic claims Tag and Phenix infringe several patents owned by Sensormatic by making and selling certain anti-theft labels intended to be affixed to retail goods. Metglas, which is not a party to the suit pending in the Southern District of Florida, supplies to Tag and/or Phenix a component of the labels. The labels use acoustmagnetic technology which contain a ribbon, known as a "resonator" or "active element," and a magnetized metal strip known as "bias." The anti-theft device, or label, attached to a retail product is detected by a electromagnetic field at a store exit if not deactivated by a store

---

[1] This case in pending in the United States District Court for the Southern District of Florida, Case No. 06:81105-Civ-Hurley/Hopkins.

employee. Sensormatic's labels, and patent, contain resonators that are "annealed to relieve stress."[2] Metglas manufactures the resonators used by Tag and Phenix. Metglas asserts that there is no "annealing" involved in its manufacturing process.[3][4] *See* Hasegawa Dep. at 313-14.

Sensormatic served Metglas with a subpoena to inspect its manufacturing facility and process to discover information about whether or not Metglas's resonators are annealed and infringe Sensormatic's patent. Metlgas opposed the subpoena request as presented by Sensormatic.

This matter is before the court on Sensormatic Electronic Corporation's (Sensormatic) Motion to Enforce Subpoena and Compel Inspection (Document # 1) pursuant to Rules 37 and 45, Fed. R.Civ.P. Sensormatic seeks to inspect the manufacturing facility and process of Metglas, Inc., which is located in Horry County, South Carolina, relating to Metglas's 2826 MB3 ribbon. Also pending before this court is Metglas's Motion for Protective Order/Confidentiality Agreement (Document # 9).

Rule 45, Fed.R.Civ.P., allows a party to command a person to "permit inspection, copying, testing or sampling of . . . tangible things in the possession, custody or control of that person, or permit inspection of the premises . . . ." Rule 45(a)(1)(c), Fed.R.Civ.P. Metglas, however, asserts

---

[2] *See* Exh. 2 to Senormatic's Motion.

[3] Metglas has provided a significant amount of discovery to Sensormatic, including approximately 1,000 pages of documents, has provided Dr. Ryusuke Hasegawa and Mr. David W. Millure as a Rule 30(b)(6) deponents. However, Dr. Hasegawa refused to answer certain questions as to the details of Metglas's manufacturing process, including the transportation of the ribbon of material from the quenching step, during which the molten starting material is deposited and cooled, to the winding step of the production process. [[[[Hasegawa Dep. at 126]]]].

[4] While Metglas asserts that the fact that its product is not "annealed" is confidential, it is apparent that the information is in the public domain. *See* Exh. Z and U to Metglas's Motion.

that the information sought by Sensormatic involves trade secrets and confidential information worthy of protection.

Rule 26(c), Fed.R.Civ.P., provides that upon motion of a party, "the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (2) that the disclosure or discovery may be had only on specified terms and conditions, . . . (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; . . . (5) that discovery be conducted with no one present except persons designated by the court; . . . (7) that a **trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way**." *Id*. (emphasis added).

As set forth in *Ex parte Sealed Air Corp. and Cryovac, Inc.*, 220 F.R.D. 452, 453 (D.S.C. 2004), the standard for discovering trade secrets includes

> The party resisting the discovery must demonstrate to the court that the information being sought is a trade secret and that its disclosure might be harmful. Once shown, the burden shifts to the party that seeks the discovery to establish the relevance of the trade secret to the lawsuit and that it is necessary to the action. If relevance and necessity are established, then the Court must balance the need for the information against the injury that would ensue if disclosure is ordered.

*Id.* 453 (internal quotes omitted)(citing *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.,* 107 F.R.D. 288 (D.Del. 1985).

As set forth above, Metglas's expert testified that their product sold to Tag is not annealed. Metglas presents sufficient evidence that its manufacturing process includes trade secrets or other confidential research, development, or commercial information. *See* Hasegawa Dep. at 200-207(filed under seal); Aff. of Dod Smith (Exh. CC to Metglas's Motion). In fact, as disclosed in Dr.

Hasegawa's deposition, Metglas goes to considerable length to protect this information. Furthermore, they have demonstrated that they would be harmed if this information was disclosed into this highly competitive market.

Sensormatic, likewise, has made a proper showing of relevance and need. Dr. Hasegawa recognized that there are disagreements about what constitutes "annealing." Hasegawa Dep. at 151-53. Also, he could not explain why the Series 58 labels exhibit properties typical of "annealing." Hasegawa Dep. at 294. Sensormatic presents what they refer to as a "good-faith" belief that the resonators supplied by Metglas are "annealed." They present evidence that the Metglas material exhibits properties that are typical of annealed materials. By affidavit, Dr. Robert C. O'Handley[5], Sensormatic's expert in the Florida Case, states he studied magneto-optic Kerr (MOKE) microscopy[6] images of Series 58 resonators and found that they exhibit properties that are typical of annealed[7] material. Specifically, he states that amorphous materials that have been annealed[8] generally exhibit domain patterns that are uniform in size and orientation and consistent through the sample except the extreme edges. *See* Exh. 4 to Sensormatic's Motion. Furthermore, he states that

---

[5] Dr. O'Handley is the inventor of Sensormatic's '334 patent.

[6] MOKE microscopy reveals domain structures at the surface of the material. O'Handley Aff. at ¶14.

[7] Apparently, "annealing" "enables optimization of low field magnetic characteristics". O'Handley Aff. at ¶12.

[8] Sensormatic identifies language in the patent "annealed to relieve stress." Dr. O'Handley defines "annealed" as an "elevated temperature has been used to relieve stress or affect other properties." O'Handley Aff. at ¶ 11 (Exh. 2 to Sensormatic's Reply).

testing revealed the k factors in four of the five Series 58 resonators[9] fell within the range as set forth in Claim 28 of Sensormatic's patent. Exh. 2, to ¶11 to Sensormatic's Reply. Dr. O'Handley states that "annealed" means elevated temperature that can be produced through application of heat or by other means. *Id*. Also, he states that annealing can be performed "after the initial fabrication of a material or a component, or it can be done during the casting process by controlling the time-temperature profile during cooling . . ." *Id*.

Further, Dr. O'Handley states that "in order to gather relevant information, I would observe Metglas, Inc.'s casting and manufacturing process from the crucible until winding the ribbon onto the spool that is used for shipping (including depositing the melt stream on the quenching wheel and catching and removing the ribbon from the quenching wheel) and obtain samples of the melt spun ribbon and samples from the take up spool at the beginning, middle, and end of the run."

Thus, Sensormatic meets the relevant and "necessary" elements of the analysis.[10] Weighing these competing interest dictates that the inspection should be allowed. Metglas, however, challenges the use of Dr. O'Handley to perform the inspection. It objects to Dr. O'Handley, in part, because Sensormatic is a competitor[11] of Metglas and Dr. O'Handley it asserts is affiliated with Sensormatic.

In deciding whether to prohibit an expert from receiving confidential information produced by a party or nonparty, the court may consider such factors as (1) the persons affiliation with the

---

[9] Series 58 resonators are manufactured by Tag and sold by Phenix and include Meglas's 2826 ribbon.

[10] Sensormatic does not dispute this.

[11] The market for this technology is highly competitive. Aff. of Dod Smith.

receiving party; (2) the extent of regular employment, consultation or association with the receiving party; (3) the expert's present involvement in the receiving party's competitive decisions; (4) the potential for future involvement of the expert in the receiving party's competitive decisions; (5) if the expert's involvement is deemed beyond the point of "independent," and the expert's willingness to curtail or forego future involvement with the receiving party. *See Digital Equipment Corp. v. Micro Technology, Inc.*, 142 F.R.D. 488, 491 (D.Col. 1992)(internal citations omitted). Also, the court should consider the "feasibility of separating either the knowledge gained or the individual from future competitive endeavors." *Id*. (internal citation omitted). A higher degree of protection may be warranted when the information involves technology. *Rice*, 39 Fed. Cl. at 750 (citing *Flight Instrument v. Sundstrand Data Control*, 682 F.Supp. 20 (D. Del. 1988).

Dr. O'Handley is co-inventor of Sensormatic's '334 patent. A review of his Personnel Record reveals his continued involvement in this and related technologies through patent applications, writing, teachings and as revealed in his "professional Statement." *See* Exh. T to Metglas's Motion.

Sensormatic presents a supplemental declaration of Dr. O'Handley where he asserts that while he is an inventor of the '334 patent, the patent has been assigned to Sensormatic and he receives no royalty or other payments dependent upon the enforceability of the patent and has no financial interest in the patent or litigation pending in the Southern District of Florida. He states that although he has maintained a consulting relationship with Sensormatic since 1998, he has no plans to consult for Sensormatic in the future and intends to terminate the agreement. He states that he is willing to refrain from "non-litigation-related" consulting work for Sensormatic or any other company in the relevant field if deemed necessary by the Court. He states that he has never been

an officer, director, or employee of Sensormatic or Tyco, Sensormatic's publicly-traded parent company. He states that he is not a shareholder of Tyco.[12] He states that he last provided non-litigation consulting services to Sensormatic in 2005. He states that to his knowledge Sensormatic and Metglas are not direct competitors, only that Metglas manufactures and sells a component of EAS labels and Sensormatic purchases such a component from a Metglas competitor which is included in Sensormatic's EAS labels. He states that he intends to retire from his position at MIT in 2008 to concentrate on a company he co-founded called Ferro Solutions. Ferro Solutions investigates the use of magnetic materials, including amorphous alloys, in (1) energy harvesters, (2) passive magnetic fields sensors and (3) wireless power receivers. Exh. 5, ¶¶ 2-6, 9 to Sensormatic's Reply.

As set forth in Metglas's Sur-Reply, Dr. O'Handley has been involved in, past, present and future, many endeavors involving magnetostriction, magnetism, the behavior of amorphous materials, including amorphous alloys, and sensors. He has a long relationship with Sensormatic and other companies, including Ferro Solutions, that are engaged in activities directly or indirectly competitive to Metglas. The undersigned is not convinced that his intended termination of his non-litigation consulting work with Sensormatic and his continued involvement in this and related technology sufficiently divorces Dr. O'Handley from Metglas's competitive market to deem him as independent.

As stated by the court in *Digital Equipment*, "[U]ltimately, the focus of the court's decision should rest on consideration of the individual's relationship to or status within the receiving party's

---

[12] Nothing expressly states whether or not Dr. O'Handley has any ownership interest in Sensormatic.

business, the likelihood of that relationship continuing, and the feasibility of separating either the knowledge gained or the individual from future competitive endeavors." *Digital Equipment Corp.*, 142 F.R.D. at 491. Based on his patents, teaching, writing, and vocational endeavors, I do not believe it is feasible for him to separate either his knowledge gained or him from future competitive endeavors. Additionally, I am not convinced that the concern over his relationship with Sensormatic is removed by his intent and willingness to terminate his non-litigation consulting with Sensormatic. In addition, his involvement with this and related technology continues through, among other things, Ferro Solutions and other patents. Based on the above, as well as the other evidence submitted by Metglas, considered together prevents Dr. O'Handley from being an "independent" expert. It should be noted that nothing herein should be inferred as questioning Dr. O'Handley's integrity in any way whatsoever. Based on his profound involvement in this particular field, including competitive involvement, the risk of inadvertent disclosure or use and the inherent difficulty in compartmentalizing this information presents a risk of human nature that should be avoided.

Therefore, based on the record, the briefs submitted, the arguments of counsel, and the applicable law, Sensormatic's motion to inspect pursuant to Rule 45 (Doc. # 1) is granted consistent with this order. In its motion and as set forth in its Rule 45 subpoena, Sensormatic seeks to be permitted to "inspect, videotape, and sample each stage of processing, including but not limited to any casting, annealing, tempering, heat treatment, magnetization, activation, and/or testing." *See* Sensormatic's Motion and attached Exh. 5. A separate order shall be filed this same date governing the logistics of the inspection.

Also, based on the record, the briefs submitted, the arguments of counsel, and the applicable law, Metglas's motion for a protective order (Doc. # 9) is granted as set forth herein. Additionally,

a Confidentiality and Protective Order shall be filed this same date.

    And it is so ordered.


January 24, 2008                                      s/Thomas E. Rogers, III
Florence, South Carolina                    Thomas E. Rogers, III
                                                            United States Magistrate Judge